[No. B183435. Second Dist., Div. Three. June 26, 2006.]

SOUTHERN CALIFORNIA EDISON COMPANY, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
STATE BUILDING AND CONSTRUCTION TRADES COUNCIL OF
CALIFORNIA, AFL-CIO, et al., Real Parties in Interest.

1086

## Counsel

Stephen E. Pickett, James M. Lehrer; O'Melveny & Myers, Gordon E. Krischer and Joshua A. Shapiro for Petitioner.

W. Davis Smith and Georgetta J. Baker for San Diego Gas & Electric Company and Southern California Gas Company as Amici Curiae on behalf of Petitioner.

Randolph L. Wu, Dale Holzschuh and Darwin E. Farrar for Respondent.

Altshuler, Berzon, Nussbaum, Rubin & Demain and Scott A. Kronland for Real Party in Interest State Building and Construction Trades Council of California, AFL-CIO.

Reich, Adell, Crost & Cvitan, Alexander B. Cvitan and Andrew L. Birnbaum for Real Party in Interest Southern California District Council of Laborers.

Weinberg, Roger & Rosenfeld, Sandra R. Benson, Patricia M. Gates and Roberta D. Perkins for Real Party in Interest Northern California Basic Crafts Alliance.

Adams Broadwell Joseph & Cardozo, Marc D. Joseph and Gloria D. Smith for Real Parties in Interest California State Pipe Trades Council and International Brotherhood of Electrical Workers, Local 1245.

OPINION

**CROSKEY, Acting P. J.**—Southern California Edison Company (Edison) challenges a decision by the Public Utilities Commission (PUC) that certain public utilities must require the payment of prevailing wages to workers on energy utility construction projects. Edison contends (1) the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.) preempts the decision; (2) the PUC committed a prejudicial abuse of discretion by violating its own procedural rules concerning the scope of issues addressed in the rulemaking proceeding; (3) the PUC provided no meaningful opportunity to respond to the proposed rulemaking and therefore denied due process; and (4) the evidence in the record does not support the decision. We conclude that the NLRA does not preempt the decision but that the PUC did fail to proceed in the manner required by law in that it violated its own procedural rules. We therefore annul the decision in part, and need not address Edison's other contentions.

## PROCEDURAL BACKGROUND

### 1. *Parties*

The PUC is the administrative agency responsible for regulating public utilities in the State of California. (Cal. Const., art. XII, §§ 5, 6; Pub. Util. Code, § 701.) Edison is an energy public utility. The real parties in interest are labor unions and other labor organizations.[1]

### 2. *Order Instituting Rulemaking and Scoping Memo*

The PUC issued an order instituting rulemaking on September 4, 2003, proposing the adoption of rules consistent with rules governing state and federal public works contracts prohibiting "bid shopping" and "reverse auctions." The order stated, " 'bid shopping' . . . occurs when prime contractors ask, require or otherwise influence subcontractors to lower bids for subcontract work after the prime contract is awarded," and described "reverse auctions" as a process in which the owner solicits bids over the Internet, the lowest bid is disclosed, and bidders repeatedly are allowed another opportunity to bid below the lowest bid. The order directed all natural gas, electric, telephone, and water utilities to file a report by October 24, 2003, explaining their contracting practices and stated that interested parties

---

[1] The real parties in interest participating in this proceeding are State Building and Construction Trades Council of California, Southern California District Council of Laborers, Northern California Basic Crafts Alliance, California State Pipe Trades Council, and International Brotherhood of Electrical Workers, Local 1245. California Rules of Court, rule 58(a)(2) defines a real party in interest in a proceeding for review of an order or decision of the PUC.

could file their opening comments on the proposal by November 21, 2003.[2] The order stated that the description of issues in the order constituted a "preliminary scoping memo" as required by the PUC's Rules of Practice and Procedure (Cal. Code Regs., tit. 20, § 1 et seq.) and that a scoping memo would be issued after a prehearing conference.[3] The order stated the PUC's preliminary determination that the rulemaking proceeding was quasi-legislative and that a decision would be made without an evidentiary hearing.

A prehearing conference took place on December 8, 2003. The assigned PUC commissioner issued a ruling and scoping memo on December 29, 2003, stating that it appeared, based on the reports filed and the prehearing conference, that the large utilities did not practice "bid shopping." The ruling and scoping memo stated further that the rulemaking proceeding was quasi-legislative, that no evidentiary hearing would be held, and that the scope of issues remained the same as stated in the preliminary scoping memo. The ruling stated that the assigned commissioner "may modify the scope of issues following the receipt and evaluation of additional information and testimony." The ruling required the unions to submit evidence concerning utility contracting procedures by February 4, 2004, and required responses to that evidence and to the opening comments on the proposal to be filed by February 25, 2004. The PUC later excused certain water utilities and smaller utilities from their obligations as respondents in the proceeding. The parties filed their responsive comments by February 25, 2004.

### 3. *Late-filed Comments, Objections, and Supplemental Comments*

The Southern California District Council of Laborers (Laborers) on October 5, 2004, filed and served electronically its opening comments on the proposed rulemaking. An accompanying e-mail message addressed to the administrative law judge stated, "The Southern California District Council of Laborers (Laborers) joined this proceeding late. Other Parties have already filed comments. The Laborers request permission to file the attached comments at this time." The administrative law judge in an e-mail message to the parties on October 8, 2004, stated, "No one at the [Commission] to whom I've spoken is able to open the document served by the Southern California District Council of Laborers, probably because of the unusual software that appears to support it. I hereby direct SCDCL to reserve the document in order

---

[2] The PUC later extended the time to file opening comments to December 5, 2003.

[3] The PUC adopted its Rules of Practice and Procedure pursuant to its rulemaking authority (Cal. Const., art. XII, § 2; Pub. Util. Code, § 701). A regulation adopted by an administrative agency under its rulemaking authority has the force and effect of law. (*Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 401 [128 Cal.Rptr. 183, 546 P.2d 687]; *California Teachers Assn. v. California Com. on Teacher Credentialing* (2003) 111 Cal.App.4th 1001, 1008 [4 Cal.Rptr.3d 369].)

that we may lawfully file it. Once the parties have received an accessible copy electronically, they have 6 business days to file replies." Laborers apparently served the comments by e-mail using a more common word processing program on October 8 and filed a hard copy of their comments and attachments on October 13, 2004.

The comments by Laborers suggested that the PUC should require project labor agreements or the payment of prevailing wages in connection with utilities' construction and maintenance contracts. The comments described a project labor agreement as an agreement that provides uniform employment terms and conditions for all persons working on a particular project. The comments discussed the benefits of the proposed requirements and cited as an example Labor Code section 1771, which requires the payment of "not less than the general prevailing rate of per diem wages" for public works contracts. Attached to the comments filed with the PUC were over 400 pages of articles, studies, and other documents concerning project labor agreements and prevailing wage laws. The exhibits were not served on the other parties, but the comments stated that copies would be provided upon request.

Several utilities objected to the late-filed comments on the ground that the new proposals were beyond the scope of issues identified by the PUC. Some stated that if the PUC decided to consider the new proposals, it should require Laborers to submit evidence in support of the proposals and allow the parties at least 30 days to consider and comment on them. One utility commented that the NLRA would preempt the proposed requirements and that the PUC had no authority to impose the requirements, but apart from those arguments no party commented on the merits of the proposals at that time. In an e-mail sent on the afternoon of Friday, November 5, 2004, the administrative law judge allowed an additional six calendar days, until November 11 at 4:00 p.m., for the parties to serve further comments "to address the legal and policy issues associated with SCDCL's proposals." The administrative law judge allowed the parties until November 12 to file the supplemental comments because the PUC's office was closed on November 11 in observance of Veterans Day.

Several parties filed supplemental comments by November 12, 2004, repeating their objections that the late-filed comments were beyond the scope of issues identified by the PUC. Some parties also stated that if the PUC decided to consider the new proposals it should require Laborers to submit evidence in support of the proposals and allow the parties at least 30 days to consider and comment on them. Some parties commented that the new proposals would be preempted by federal law and briefly challenged the merits of the proposals.

### 4. *Draft Decisions and Final Decision*

The assigned PUC commissioner issued a draft decision on November 16, 2004, proposing an order that would prohibit utilities from conducting "reverse auctions," require utilities to require the payment of prevailing wages to workers on utility construction projects, and continue the rulemaking proceeding with respect to project labor agreements. Another commissioner issued an alternative draft decision on December 2 proposing a similar order but without a provision for further consideration of project labor agreements. Several utilities and labor organizations commented on the draft decisions.

The PUC issued its Decision No. 04-12-056 on December 16, 2004, and amended clerical errors in the decision on December 28. The decision as amended prohibits the parties to the rulemaking proceeding from conducting "reverse auctions" in connection with construction projects and states that the utilities "shall require the payment of prevailing wages to workers who are employed on energy utility construction projects."

### 5. *Applications for Rehearing and Denial of Rehearing*

Edison applied for a rehearing of the PUC's decision, arguing that the NLRA preempted the decision, that the PUC violated its own procedural rules and committed a prejudicial abuse of discretion by adopting a proposal that was beyond the scope of issues identified in the scoping memo, that the PUC denied the utilities a meaningful opportunity to be heard and therefore violated due process, and that the evidence in the record did not support the decision, among other arguments. Other utilities also applied for a rehearing on similar grounds. The PUC issued an order modifying the decision and denying a rehearing in May 2005. The order modified the decision by deleting language that stated that no utility had argued that the payment of prevailing wages would increase construction costs and that "the appropriate state standards and enforcement authorities would ensure compliance" with the prevailing wage requirement.

The order addressed several of the arguments presented in support of the applications for a rehearing. The PUC construed the assertions of procedural error as due process challenges and did not address the argument that the PUC prejudicially abused its discretion by failing to comply with its own procedural rules. The PUC acknowledged that "the [prevailing wage] issue was added after development of the scoping memo," but noted that the scoping memo stated that the assigned PUC commissioner could " ' "modify the scope of issues following receipt and evaluation of additional information and testimony" ' " (underscoring omitted). The PUC concluded that this

language in the scoping memo provided adequate "notice that additional issues might subsequently be included in the proceeding," and stated that its conclusion was consistent with the PUC's practice of " 'establish[ing] new rules or requirements in numerous proceedings without including those changes in the initial rulemaking or scoping memo, but incorporating those changes along the way pursuant to an ALJ or Assigned Commissioner Ruling as was accomplished here.' " The order stated that the parties initially were allowed one week to comment on the prevailing wage proposal, and three weeks later were allowed "an additional week for supplemental comments," and stated, "The time provided Applicants to respond was greater than that established by many of the local rules of court and cannot reasonably be considered arbitrary and capricious. Applicants' assertions, while indicative of the heavy burden occasionally imposed by proceedings, do not show a deprivation of due process."

### 6. *Writ of Review*

Edison petitioned this court for a writ of review (Pub. Util. Code, § 1756). We granted the writ, directed the PUC to certify its record, and scheduled oral argument. After the PUC had provided its certified record, we ordered it either to augment the certified record with any orders or correspondence by the PUC directed to the respondents in the rulemaking proceeding that were not included in the original certified record, or explain why certain e-mails were not included in the certified record. The PUC augmented the record with rulings and other electronic communications by the administrative law judge.

## CONTENTIONS

Edison contends (1) the NLRA preempts the decision by the PUC ordering utilities to require the payment of prevailing wages on energy utility construction projects; (2) the PUC committed a prejudicial abuse of discretion by violating its own procedural rules concerning the scope of issues addressed in the rulemaking proceeding; (3) the PUC provided no meaningful opportunity to respond to the new proposal and therefore denied due process; and (4) there is no evidence in the record to support the decision.

## DISCUSSION

### 1. *Nature of this Proceeding and Scope of Review*

Any party aggrieved by an order or decision of the PUC may petition for a writ of review in the Court of Appeal or Supreme Court. (Pub. Util. Code, § 1756, subd. (a).) A writ of review or mandamus in the Court of Appeal or

Supreme Court is the exclusive means of judicial review of an order or decision by the PUC. (*Id.*, § 1759.) Because review by extraordinary writ is the only means of judicial review, a court ordinarily has no discretion to deny a timely-filed petition for writ of review if it appears that the petition may be meritorious. (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1193 [13 Cal.Rptr.3d 630].) The petitioner can challenge an order or decision in court only on grounds specifically set forth in an application for a rehearing previously presented to the PUC.[4] (Pub. Util. Code, § 1732.)

Public Utilities Code section 1757.1 describes the scope of review in a proceeding other than a complaint or enforcement proceeding or a ratemaking or licensing decision of specific application to particular parties (see *id.*, § 1757), and therefore applies here. Review under section 1757.1 is limited to determining based on the entire record certified by the PUC whether "(1) The order or decision of the commission was an abuse of discretion. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The commission has acted without, or in excess of, its powers or jurisdiction. [¶] (4) The decision of the commission is not supported by the findings. [¶] (5) The order or decision was procured by fraud. [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (Pub. Util. Code, § 1757.1, subd. (a).)

Before reviewing the decision under the appropriate standard of review, however, we must first address an important legal issue. In light of the decision we reach in this matter on the dispositive procedural question, it is entirely likely that the issue of federal preemption will again arise in any future proceedings that might take place before the PUC with respect to the subject matter of its Decision No. 04-12-056 that has been attacked by the pending petition for a writ of review. In order to provide guidance to the PUC, the petitioner and real parties in interest in any such future proceedings, we will now address the federal preemption question.

2. *The NLRA Does Not Preempt the Prevailing Wage Requirement*

a. *Implied Preemption under the NLRA*

 The NLRA declares the policy of the United States to eliminate or mitigate obstructions to the free flow of commerce caused by industrial strife, unrest, and unequal bargaining power, "by encouraging the practice and

---

[4] We decline to address the argument by real parties in interest California State Pipe Trades Council and International Brotherhood of Electrical Workers, Local 1245, that the decision is unconstitutionally vague because no party challenged the decision on that ground in an application for a rehearing. (Pub. Util. Code, § 1732.)

procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." (29 U.S.C. § 151.) Section 7 of the act protects employees' rights to self-organization, to bargain collectively, and "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," and their right generally to refrain from those activities. (29 U.S.C. § 157.)[5] Section 8 of the act prohibits unfair labor practices by employers and labor organizations (29 U.S.C. § 158(a), (b)), stating among other things that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157" (*id.*, § 158(a)) and for a labor organization "to restrain or coerce . . . employees in the exercise of the rights guaranteed in section 157" (*id.*, § 158(b)). The act authorizes the National Labor Relations Board (NLRB) to adjudicate disputes concerning unfair labor practices and to prevent any person from engaging in an unfair labor practice affecting commerce. (*Id.*, § 160.)

▇ The NLRA contains no express preemption provision. We should not infer a congressional intent to preempt a state law unless the state law " ' "conflicts with federal law or would frustrate the federal scheme, or unless [we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." ' " (*Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 747–748 [85 L.Ed.2d 728, 105 S.Ct. 2380] (*Metropolitan Life*).) The United States Supreme Court has stated, " '[I]n fields of traditional state regulation, . . . we have worked on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." ' [Citation.]" (*California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.* (1997) 519 U.S. 316, 325 [136 L.Ed.2d 791, 117 S.Ct. 832].) "[P]re-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." (*Fort Halifax Packing Co. v. Coyne* (1987) 482 U.S. 1, 21 [96 L.Ed.2d 1, 107 S.Ct. 2211] (*Fort Halifax*).) The Supreme Court has articulated two doctrines of implied preemption under the NLRA, known as *Garmon* and *Machinists* preemption.

---

[5] "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3)." (29 U.S.C. § 157.)

■ *"Garmon* preemption" derives from *San Diego Unions v. Garmon* (1959) 359 U.S. 236, 245–247 [3 L.Ed.2d 775, 79 S.Ct. 773] (*Garmon*), which held that when an activity arguably is protected or prohibited by section 7 or 8 of the NLRA (29 U.S.C. §§ 157, 158), states must yield to the primary jurisdiction of the NLRB and have no jurisdiction to regulate the activity. *Garmon* stated that preemption is necessary to avoid a potential conflict between state regulation and enforcement and regulation and enforcement by the NLRB, and because Congress entrusted the NLRB with the administration of our national labor policy.[6] (*Garmon, supra,* at pp. 241–245.) *Garmon* stated, however, that states retain jurisdiction to regulate "where the activity regulated [is] a merely peripheral concern of the Labor Management Relations Act"[7] or "where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act. [Fn. omitted.]" (*Garmon,* at p. 244.) The Supreme Court has explained that the "inflexible application of the [*Garmon*] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." (*Farmer v. Carpenters* (1976) 430 U.S. 290, 302 [51 L.Ed.2d 338, 97 S.Ct. 1056]; accord, *Sears, Roebuck & Co. v. Carpenters* (1977) 436 U.S. 180, 188–189 & fn. 13 [56 L.Ed.2d 209, 98 S.Ct. 1745].)

■ *"Machinists* preemption" applies to state regulation of conduct that Congress intended to be unregulated " 'to be controlled by the free play of economic forces.' " (*Machinists v. Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132, 140 [49 L.Ed.2d 396, 96 S.Ct. 2548] (*Machinists*).) "The Court recognized in *Machinists* that ' "Congress has been rather specific when it has come to outlaw particular economic weapons" ' [citation] and that Congress' decision to prohibit certain forms of economic pressure while leaving others unregulated represents an intentional balance ' "between the uncontrolled power of management and labor to further their respective interests." ' [Citation.] States are therefore prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts [citation], unless such restrictions presumably were contemplated by Congress." (*Golden State Transit Corp. v. Los Angeles* (1986) 475 U.S. 608, 614–615 [89 L.Ed.2d 616, 106 S.Ct. 1395].)

---

[6] "This rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' 'integrated scheme of regulation,' *Garmon,* 359 U.S., at 247, embodied in §§ 7 and 8 of the NLRA, which includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the Act. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S., at 748–749, and n. 26." (*Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.* (1993) 507 U.S. 218, 225 [122 L.Ed.2d 565, 113 S.Ct. 1190].)

[7] The NLRA is part of the Labor Management Relations Act (29 U.S.C. § 141 et seq.).

b. *The Prevailing Wage Requirement Is Not Subject to* Machinists *Preemption*

*Metropolitan Life, supra,* 471 U.S. at page 758 held that the *Machinists* doctrine did not preempt a Massachusetts statute requiring certain types of insurance policies and employee health care plans to provide minimum mental health care benefits, as applied to a plan negotiated pursuant to a collective bargaining agreement. The court began by stating, "Congress apparently did not consider the question whether state laws of general application affecting terms of collective-bargaining agreements subject to mandatory bargaining were to be pre-empted. That being so, 'the Court must construe the Act and determine its impact on state law in light of the wider contours of federal labor policy.' [Citation.]" (*Id.* at p. 753, fn. omitted.)

■ "The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, *and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions.* [Citation.] The NLRA's declared purpose is to remedy '[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association.' § 1, 29 U.S.C. § 151." (*Metropolitan Life, supra,* 471 U.S. at p. 753, italics added.) One of the goals of the act was to resolve the problem of depressed wages, which was believed to contribute to economic decline. (*Id.* at p. 754.) Congress hoped to resolve that problem "by establishing procedures for more equitable private bargaining." (*Ibid.*)

"The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement. No incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA." (*Metropolitan Life, supra,* 471 U.S. at pp. 754–755.)

■ "Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act." (*Metropolitan Life, supra,* 471 U.S. at p. 755.) "It would further few of the

purposes of the Act to allow unions and employers to bargain for terms of employment that state law forbids employers to establish unilaterally." (*Ibid.*) *Metropolitan Life* stated further, "there is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization. To the contrary, we believe that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety." (*Id.* at p. 756.) *Metropolitan Life* concluded, "Though § 47B, like many laws affecting terms of employment, potentially limits an employee's right to choose one thing by requiring that he be provided with something else, it does not limit the rights of self-organization or collective bargaining protected by the NLRA, and is not pre-empted by that Act." (*Id.* at p. 758.)

The Supreme Court later held that the *Machinists* doctrine did not preempt a Maine statute requiring employers to provide severance pay in the event of a plant closing, stating, "Both employers and employees come to the bargaining table with rights under state law that form a ' "backdrop" ' for their negotiations. [Citation.] . . . [T]he mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for 'there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining.' [Citation.]" (*Fort Halifax, supra,* 482 U.S. at pp. 21–22.)

██ We construe *Metropolitan Life, supra,* 471 U.S. 724 and *Fort Halifax, supra,* 482 U.S. 1 to mean that the NLRA does not preempt a state law or regulation that establishes substantive terms of employment, as long as the purpose of the law or regulation is not incompatible with the general goals of the NLRA to restore the equality of bargaining power and resolve the problem of depressed wages. The NLRA protects the *processes* of collective bargaining with respect to employment terms that may be the subject of collective bargaining, but it was not intended to preclude state regulation of substantive terms of employment. Although state regulation of substantive terms of employment may affect the results of bargaining on those and other terms, the NLRA was not intended to prevent such an indirect effect on the rights of collective bargaining and self-organization. (*Metropolitan Life, supra,* at pp. 754–755; *Fort Halifax, supra,* at pp. 21–22.)

The prevailing wage requirement at issue here governs a substantive employment term but does not affect the processes of collective bargaining or self-organization. The fact that wage rates are a subject of collective bargaining does not support a claim of preemption because the NLRA does not

preempt state regulation of an employment term merely because it may be a subject of collective bargaining. (*Fort Halifax, supra*, 482 U.S. at pp. 21–22.) As in *Metropolitan Life, supra*, 471 U.S. at page 755, the prevailing wage requirement affects union and nonunion workers equally, is unrelated to the collective bargaining process, and has no significant effect on the right of self-organization protected by the NLRA. (Cf. *People v. Hwang* (1994) 25 Cal.App.4th 1168, 1181–1182 [31 Cal.Rptr.2d 61] [held that the public works prevailing wage law of Lab. Code former § 1770 et seq. was not preempted by the NLRA].)

Edison argues that the prevailing wage requirement is "directly related to the collective bargaining process" because the PUC stated in its decision, "In most instances, prevailing wage determinations reflect collectively bargained wage rates." (*Order Adopting Rules for Utility Construction Contracting* (2004) Cal. P.U.C. Dec. No. 04-12-056, p.17.) We conclude, as did *Metropolitan Life, supra*, 471 U.S. at pages 753–756, that the prevailing wage requirement governs a substantive employment term but does not affect the processes of collective bargaining or self-organization. The PUC's observation as to the reality that prevailing wages usually reflect collectively bargained wages does not alter our conclusion.

Edison also argues that rather than only set minimum wages, the prevailing wage requirement fixes wages and therefore is not a true minimum labor standard. In our view, the rule that we believe flows from *Metropolitan Life, supra*, 471 U.S. 724 and *Fort Halifax, supra*, 482 U.S. 1 does not turn on the characterization of a regulation as a "minimum labor standard" as opposed to some other type of regulation of a substantive term of employment. Rather, *Metropolitan Life* and *Fort Halifax* state more generally that the NLRA is not concerned "with particular substantive terms of the bargain" (*Metropolitan Life, supra*, at p. 753) and does not preempt state law merely because it regulates matters that may be the subject of collective bargaining (*Fort Halifax, supra*, at pp. 21–22). In any event, we have no trouble concluding that the prevailing wage requirement is, as a practical matter, a minimum labor standard as we understand that term in this context of the facts of this case.

▉ The PUC's decision, as amended, states that the energy utilities "shall require the payment of prevailing wages to workers who are employed on energy utility construction projects." (*Order Adopting Rules for Utility Construction Contracting, supra*, Cal. P.U.C. Dec. No. 04-12-056, pp. 30–31.) Although the decision does not expressly state that prevailing wages shall be the minimum wages paid, it so implies. Discussing the prevailing wage proposal, the decision describes the question presented as "whether setting minimum wage requirements for use in utility construction contracts also

constitutes a state minimum labor standard which would escape federal preemption." (*Id.* at p. 23.) The decision states further, "Setting minimum wage requirements neither attempts 'to regulate conduct which is either arguably protected or prohibited by the NLRA[]' [citation] (which would trigger *Garmon* preemption) nor does it interfere 'in activity which Congress intended to be unregulated[]' [citation] (which would trigger *Machinists* preemption)." (*Id.* at p. 25.) Moreover, the decision refers to Labor Code section 1771, which requires the payment of "not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed" to workers on *public works* projects, as a law that requires the payment of prevailing wages.[8] Construing the order in the context of the decision as a whole, we conclude that it requires the payment of *not less than* the prevailing wages and does not require the payment of the prevailing wages as fixed amounts.

Edison relies heavily on *Chamber of Commerce of U.S. v. Bragdon* (9th Cir. 1995) 64 F.3d 497 (*Bragdon*), in which the Ninth Circuit held that a prevailing wage requirement was preempted under the *Machinists* doctrine. *Bragdon* involved a Contra Costa County ordinance that required *private* employers to pay prevailing wages to employees on certain types of construction projects costing over $500,000. (*Id.* at p. 498.) *Bragdon* noted that unlike prevailing wage laws applicable to public employers that had been determined to be nonpreempted, the ordinance applied to private employers. (*Id.* at pp. 501, 504.) *Bragdon* also stated that the prevailing wages for each craft would be determined by the Department of Industrial Regulations based on rates that other parties in the locality had agreed to through collective bargaining, and that the ordinance would affect not only the total amount of wages and benefits paid but also the division between wages and other benefits. (*Id.* at p. 502.) *Bragdon* acknowledged that the Supreme Court had held that some minimum labor standards were not inconsistent with the goals of the NLRA and therefore were not preempted. (*Bragdon, supra,* at pp. 500–501, citing *Metropolitan Life, supra,* 471 U.S. 724 and *Fort Halifax, supra,* 482 U.S. 1.) *Bragdon* stated, however, that the prevailing wage ordinance would have a greater effect on the collective bargaining process than the more limited measures in those cases, and that it "could redirect efforts of employees not to bargain with employers, but instead, to seek to set minimum wage and benefit packages with political bodies." (*Bragdon, supra,* at pp. 502, 504.) The majority concluded, "this type of minimum labor standard enactment, which is not of general application, but targets particular workers in a particular industry and is developed and revised from the

---

[8] The decision states, "California Labor Code Section []1771 requires that contractors pay prevailing wages to employees working on public works projects." (*Order Adopting Rules for Utility Construction Contracting, supra,* Cal. P.U.C. Dec. No. 04-12-056, p. 17.)

bargaining of others, affects the bargaining process in a way that is incompatible with the general goals of the NLRA," and therefore held that the ordinance was preempted.[9] (*Bragdon, supra*, at p. 504.)

The Ninth Circuit, in two more recent decisions, held that apprentice prevailing wage laws in California were not preempted by the NLRA and disapproved *Bragdon, supra*, 64 F.3d 497 in part (*Associated Buil. and Contrac., Sout. Cal. v. Nunn* (9th Cir. 2004) 356 F.3d 979, 990 (*Nunn*)), distinguished *Bragdon* in part (*Nunn, supra*, at pp. 990–991), or did not cite *Bragdon* or adopt its reasoning (*Dillingham Const. N.A., Inc. v. County of Sonoma* (9th Cir. 1999) 190 F.3d 1034, 1038–1041 (*Dillingham*)).

In *Nunn*, a contractors association sought to enjoin the enforcement of state regulations imposing wage and benefit minimums for state-registered apprentices on both public and private construction projects. The *Nunn* court rejected the preemption arguments advanced by the association. Following *Metropolitan Life, supra*, 471 U.S. 724 and *Fort Halifax, supra*, 482 U.S. 1, *Nunn* held that the state regulations at issue were not preempted because they established "minimum wages, benefits, or other '[m]inimum state labor standards [that] affect union and non-union employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. [Citation.]' " (*Nunn, supra*, 356 F.3d at p. 989.) *Nunn* acknowledged its earlier decision in *Bragdon, supra*, 64 F.3d 497, but noted that it "must be interpreted in the context of Supreme Court authority and our other, *more recent*, rulings on NLRA preemption" (*Nunn, supra*, at p. 990, italics added), including *Dillingham, supra*, 190 F.3d 1034. "It is now clear in this Circuit that state substantive labor standards, including minimum wages, are not invalid simply because they apply to particular trades, professions, or job classifications rather than to the entire labor market." (*Nunn, supra*, 356 F.3d at p. 990.) The Ninth Circuit in *Dillingham* held that the NLRA did not preempt a state law that required the payment of prevailing wages to employees in apprenticeship programs not approved by the State of California but allowed the payment of lower wages to employees in state-approved programs. Without mentioning *Bragdon, Dillingham* held that *Metropolitan Life* and *Fort Halifax* compelled the conclusion that the prevailing wage law was not preempted. (*Dillingham, supra*, 190 F.3d at pp. 1039–1041.)

In our view, the conclusion by the Ninth Circuit in *Bragdon, supra*, 64 F.3d 497 that the Contra Costa County ordinance imposed a substantive requirement that impermissibly intruded on the collective bargaining process is inconsistent with the rule articulated by the Supreme Court that state regulation of the substantive terms of employment, which does not govern the

---

[9] The majority opinion reflected the views of two judges, while a third judge only concurred in the result. (*Bragdon, supra*, 64 F.3d at p. 504 (conc. opn. of Fletcher, J.).)

*processes* of collective bargaining or self-organization and is not inconsistent with the general goals of the NLRA is not subject to *Machinists* preemption. (*Metropolitan Life, supra,* 471 U.S. at p. 758.) We therefore decline to follow *Bragdon.*

 c. *The Prevailing Wage Requirement Is Not Subject to* Garmon *Preemption*

 *Garmon* preemption prohibits state regulation that impinges on the primary jurisdiction of the NLRB to regulate activities that are protected by section 7 or constitute an unfair labor practice under section 8 of the NLRA (29 U.S.C. §§ 157, 158), as stated *ante.* The conclusion that state regulation of substantive terms of employment does not affect the right to bargain collectively or the right to self-organization compels the conclusion that such regulation does not regulate conduct arguably protected or prohibited by section 7 or 8 of the NLRA. (*Fort Halifax, supra,* 482 U.S. at pp. 22–23, fn. 16; *Nunn, supra,* 356 F.3d at pp. 987–988.) Therefore, the prevailing wage requirement here at issue cannot be subject to *Garmon* preemption.

 3. *The PUC Failed to Proceed in the Manner Required by Law*

 ■ The PUC's Rules of Practice and Procedure define "scoping memo" in pertinent part as "an order or ruling describing the issues to be considered in a proceeding and the timetable for resolving the proceeding." (Cal. Code Regs., tit. 20, § 5.) The rules require the PUC to issue a preliminary scoping memo in a rulemaking proceeding and provide for objections to the preliminary scoping memo. (Cal. Code Regs., tit. 20, § 6, subd. (c)(2).) The assigned PUC commissioner then must make a ruling on the scoping memo that "finally determine[s] the schedule . . . and issues to be addressed" in the proceeding.[10] Cal. Code Regs., tit. 20, § 6.3 (rule 6.3).) A rulemaking proceeding ordinarily must be resolved within 18 months after the scoping memo is issued. (Pub. Util. Code, § 1701.5; Cal. Code Regs., tit. 20, § 6, subd. (e).)

 The rulemaking proceeding commenced on September 4, 2003, with the issuance of the PUC's order instituting rulemaking. The order included a preliminary scoping memo describing the issues to be addressed as whether to adopt rules to prohibit "bid shopping" and "reverse auctions" consistent

---

 [10] "At or after the prehearing conference (if one is held), or if there is no prehearing conference as soon as possible after the timely filing of the responsive pleadings (protests, responses, or answers, as appropriate), the assigned Commissioner shall rule on the scoping memo for the proceeding, which shall finally determine the schedule (with projected submission date) and issues to be addressed. In an adjudicatory proceeding, the scoping memo shall also designate the presiding officer." (Cal. Code Regs., tit. 20, § 6.3.)

with rules governing state and federal public works contracts. The utilities filed reports concerning their contracting practices, and the utilities and labor organizations submitted their opening comments on the proposal by December 5, 2003. The assigned PUC commissioner issued a ruling and scoping memo on December 29, 2003, stating that the parties agreed that the large utilities did not practice "bid shopping," but also stating, "The scope of issues remains those identified in [the Order Instituting Rulemaking]." Neither the preliminary scoping memo nor the scoping memo suggested that the scope of issues to be addressed included consideration of a proposed prevailing wage requirement.

Some real parties in interest argue that the scope of issues described in the preliminary scoping memo was sufficiently broad to encompass the prevailing wages proposal. They cite language in the introductory Summary section of the order instituting rulemaking in which the PUC stated, "we will consider adopting rules to ensure that utility construction contracting practices are consistent with rules governing state and federal public works contracting practices." We construe this introductory language in the context of the discussion and directives that followed in the order. That discussion addressed specifically only state and federal law prohibitions against "bid shopping" and "reverse auctions," and the PUC directed the utilities to provide information concerning those practices only. As the assigned PUC commissioner stated in the scoping memo, the preliminary scoping memo "addressed two types of contracting procedures that may be problematic. One, called 'reverse auctions,' . . . . The other, called 'bid shopping,' . . . ."

The PUC acknowledges that the prevailing wage proposal was an "issue . . . added after development of the scoping memo." It argues, however, that it has interpreted rule 6.3 to allow the assigned commissioner or administrative law judge to add new issues after issuance of the scoping memo and that we should defer to the PUC's interpretation of its own regulation. The PUC also cites language in the scoping memo stating that the assigned commissioner "may modify the scope of issues following the receipt and evaluation of additional information and testimony." Assuming without deciding that the PUC in some circumstances may add a new issue after the scoping memo has issued, the question is the manner that it did so here and the circumstances of this particular proceeding. The specific question presented here is whether by adding the prevailing wage proposal as a new issue in the manner that it did the PUC "proceeded in the manner required by law" (Pub. Util. Code, § 1757.1, subd. (a)(2)).

Laborers filed its opening comments and over 400 pages of supporting materials in October 2004, 10 months after the opening comments were due, more than nine months after the scoping memo was issued, and more than seven

months after the responsive comments were due. Rather than comment on the proposals described in the scoping memo, Laborers offered new proposals by suggesting for the first time in this proceeding that the PUC should require project labor agreements or the payment of prevailing wages. The e-mail message by the administrative law judge on October 8 stated that she was unable to open the document and allowed the parties six business days to respond to the late-filed comments after service of a readable document, but did not suggest in any manner that the administrative law judge was aware of Laborers's new proposals or intended to modify the scope of issues in the proceeding to include the new proposals. Most of the responsive comments were limited to objections that the new proposals were beyond the scope of issues identified in the scoping memo. Those objections were appropriate in our view. We cannot fault the parties for failing to respond to the merits of proposals that were not encompassed in the scoping memo absent an order amending the scope of issues to include the new proposals.

The administrative law judge apparently amended the scope of issues to include the new proposals on Friday, November 5, 2004. An e-mail from the administrative law judge to the parties that afternoon briefly described the new proposals and stated: "Several utilities filed reply comments to the SCDCL's proposals, all of them in opposition to them. Reply comments generally allege that the proposals are untimely, outside the scope of the proceeding, poor public policy and possibly contrary to state and federal labor laws. Some of the parties' reply comments also complained that the parties had only a limited time to address SCDCL's proposals. [¶] This ruling provides an additional opportunity for parties to address the legal and policy issues associated with SCDCL's proposals. Parties may file supplemental reply comments on SCDCL's October 5 proposals. The supplemental reply comments must be served electronically no later than 4 pm on November 11, 2004." November 11 was Veterans Day, a state and federal holiday. (Gov. Code, § 9700.) Excluding the weekend and holiday, the time allowed for the parties to respond to the merits of the new proposals was only three business days. Three business days was insufficient time for the parties to comment on the issues raised by the proposals, including issues of public policy, economic effects, legal implications, and effective administration and implementation of the proposed new rules. The PUC's failure to comply with its own rules concerning the scope of issues to be addressed in the proceeding therefore was prejudicial.

■ In summary, the prevailing wage proposal was beyond the scope of issues identified in the scoping memo, the PUC violated its own rules by considering the new issue, and three business days was insufficient time for the parties to respond to the new proposals. We therefore conclude that the PUC failed to proceed in the manner required by law (Pub. Util. Code, § 1757.1, subd. (a)) and that the failure was prejudicial.

## *DISPOSITION*

Decision No. 04-12-056 is annulled to the extent it orders the respondents to the proceeding to require the payment of prevailing wages to workers employed on energy utility construction projects. Edison is entitled to recover its costs in this proceeding from the PUC and the real parties in interest.

Kitching, J., and Aldrich, J., concurred.

The petition of real party interest Southern California District Council of Laborers for review by the Supreme Court was denied September 13, 2006, S145621. Chin, J., and Corrigan, J., did not participate therein.